STATE of North Dakota, Plaintiff,

v.

Patrick GRONLIE, Defendant.

STATE of North Dakota, Plaintiff,

v.

Dale HECK, Defendant.

Crim. Nos. 464, 465.

Supreme Court of North Dakota.

Dec. 4, 1973.

Paul M. Sand, First Asst. Atty. Gen., Bismarck, for State Parole Board.

Neil W. Fleming, State's Atty., of Pembina County, Cavalier.

William S. Heigaard, State's Atty., and F. Gene Gruber, Asst. State's Atty., Cavalier County, Langdon.

John F. LaQua, Langdon, for defendants Gronlie and Heck on certified question.

ERICKSTAD, Chief Justice.

Two questions have been certified to this court. The trial court has answered the first question *No* and the second question *Yes.* The questions follow:

"1) Does the District Court, the sentencing Court, retain jurisdiction in an instance where a Defendant has been sentenced to the State Farm for the purpose of modification, vacation, or suspension of the original sentence?

"2) Does the State Parole Board have jurisdiction to hear or grant parole to persons who have been sentenced to the State Farm?"

For purposes of background, we quote the pertinent parts of the trial court's findings of fact.

"1.

" * * * on January 29, 1973, Defendant Patrick Gronlie pleaded guilty to, and was convicted of, the crime of burglary in District Court of the Second Judicial District within and for the County of Pembina, State of North Dakota, and was sentenced to one year at the North Dakota State Farm located in Burleigh County, North Dakota; and that such Defendant presently is confined at this institution;

"2.

" * * * on April 19, 1973, Defendant Dale Heck pleaded guilty to and was convicted of the crime of burglary, pleading guilty to eight separate counts thereof, in District Court of the Second Judicial District within and for the County of Cavalier, State of North Dakota; and such Defendant, on count one, was sentenced to the North Dakota State Farm located in Burleigh County, North Dakota; that on the remaining seven counts, such Defendant was placed on probation under N.D.C.C. 12–53, Suspension of Imposition of Judgment, for four years, and all of such sentences were or-

dered to run concurrently; and such Defendant presently is confined at the State Farm;

"3.

" * * * on May 4, 1973, the Attorney General of the State of North Dakota issued an Opinion that the Parole Board of the State of North Dakota does not have parole jurisdiction over inmates of the State Farm;

"4.

" * * * thereafter each of the Defendants, Patrick Gronlie and Dale Heck, made letter application to the sentencing Court for vacation of or modification of each such sentence to the State Farm; that each of the Defendants, Patrick Gronlie and Dale Heck, on September 4, 1973, the date of this hearing, filed further written applications for an appropriate Order for reduction or vacation of sentence by the sentencing Court, or in the alternative, that the sentencing Court issue its appropriate Order to the North Dakota State Parole Board to hear forthwith an application for parole;

"5.

" * * * the response in this proceeding by the Parole Board admits that the facts set forth in each such Defendant's application for Appropriate Order dated September 4, 1973, is an accurate recitation of the facts, specifically, that unless ordered by the sentencing Court, the State Parole Board will not acknowledge, give consideration to, or hear such parole applications."

All parties agree that the first question is correctly answered on the basis of John v. State, 160 N.W.2d 37 (N.D.1968).

■ Although *John* does not involve a commitment to the State Farm as in the instant case, we believe that the rationale of *John* is that once the trial court has sentenced a person charged with the com·

mission of a felony and convicted of a felony to the State Farm, the trial court loses jurisdiction. This is so except when Rule 35 of the North Dakota Rules of Criminal Procedure, effective November 1, 1973, applies.

"RULE 35. Correction or Reduction of Sentence.

"The sentencing court may correct an illegal sentence at any time and may correct a sentence imposed in an illegal manner within the time provided herein for the reduction of sentence. The sentencing court may reduce a sentence within 120 days after the sentence is imposed, or within 120 days after receipt by that court of a mandate issued upon affirmance of the judgment or dismissal of the appeal, or within 120 days after entry of any order or judgment of the Supreme Court of the United States denying review of, or having the effect of upholding, a judgment of conviction. The court may also reduce a sentence upon revocation of probation as provided by law." N.D.R.Crim.P.

We conclude, since Rule 35 is not applicable in the instant case, that the trial court correctly answered question No. 1, both defendants having been charged with the commission of a felony, both having been convicted thereof, and both having been sentenced to the State Farm, Gronlie on January 29, 1973, and Heck on April 19, 1973, for one year.

We move on to consideration of question No. 2, involving the authority and jurisdiction of the State Parole Board over persons committed to the State Farm.

Because of the peculiar alignment of counsel and parties in this case, wherein counsel appointed on behalf of the defendants and the respective State's attorneys of the counties involved in the original proceedings are seeking the same objective, namely the affirmance of the trial court's answers to the two certified questions, and the First Assistant Attorney General is seeking a reversal of the trial court's answer to question No. 2, in support of the position taken by the State Parole Board consistent with the Attorney General's opinion of May 4, 1973, referred to in paragraph 3 of the findings of fact, we shall refer to arguments made on behalf of the Parole Board's position as arguments made by the Parole Board and to arguments made in support of the trial court's position as arguments made by the court.

The Parole Board contends that a review of Section 76 of the North Dakota Constitution creating the Board of Pardons and Chapters 12-51, 12-55, and 12-59 of the North Dakota Century Code should convince us that the State Parole Board does not have jurisdiction to hear applications for parole or to grant paroles to persons sentenced to the State Farm. It concedes, however, that the State Pardon Board may have such jurisdiction because of its constitutional origin and asserts that maybe the director of institutions or the warden or the two together may have such jurisdiction under the statutes.

The pertinent part of Section 76 reads:

"The governor shall have *power* in conjunction with the board of pardon of which the governor shall be ex-officio a member and the other members of which shall consist of the attorney-general of the state of North Dakota, the chief justice of the supreme court of the state of North Dakota, and two qualified electors who shall be appointed by the governor, to remit fines and forfeitures, *to grant reprieves, commutations and pardons after conviction for all offenses except treason and cases of impeachment; but the legislative assembly may by law regulate the manner in which the remission of fines, pardons, commutations and reprieves may be applied for. * * *"* [Emphasis added.]

It is the Board's contention that as it was created by the Legislature it has only such powers as have been granted to it by the Legislature or such powers as may be

necessarily implied from some grant by the Legislature. It asserts that the duties and the functions of the Board are set out in Chapter 12–59 and that nowhere in this chapter is any reference found to the State Farm.

An examination of Chapter 12–59 discloses no reference to the State Farm. The State Penitentiary and persons confined to it are often mentioned.

Specific references to the Penitentiary follow:

"12–59–07. * * * No parole shall be granted to any person confined in the penitentiary unless:

"1. He has maintained a good record at the peniteniary for a reasonable period prior to his application * * *"

"12–59–12. * * * The board may reconsider its action in granting a parole to any convict at any time before such convict has been released and finally discharged from the penitentiary. * * *"

"12–59–13. * * * No person serving an indeterminate sentence shall be released from the penitentiary merely because the minimum term of his sentence has expired, * * *"

"12–59–15. * * * Any person shall be deemed to be in the custody and under the control of the board while on parole, and shall be subject, at any time until the expiration of the term for which he was sentenced, to be taken into actual custody and returned to the penitentiary. The board shall enforce the rules and regulations made by it for the paroling of persons committed to the penitentiary. When it shall appear to the board after a full hearing that a person out on parole has violated any of such rules or regulations, it may order that such person be taken into actual custody and recommitted to and confined in the penitentiary as provided in his sentence. The board shall enter any such order in the record of its proceedings. A copy of the order certified by the clerk of the board may be delivered to any sheriff or other peace officer of the state for service and return, and it shall be the duty of any such officer to receive the same, to apprehend and immediately to return any person named in the order, and to deliver him to the warden of the penitentiary. * * *"

"12–59–16. * * * The officer executing an order for the recommitment of a prisoner to the penitentiary shall endorse a return of his doings thereon, and shall deliver the execution, a copy of the order of recommitment, and his return to the warden, with the person named therein. The warden shall deliver to such officer a certificate acknowledging the receipt of the person, the certified copy of the order, and the return, and such certificate shall be retained by the officer making the return. The fees of an officer for executing such an order shall be the same as are prescribed for the commitment of a person to the penitentiary under a sentence of the court, but in no case shall such fees exceed the sum of one hundred dollars."

The omitted sections speak generally and make no reference to either the State Penitentiary or the State Farm.

The Board further refers us to an exhibit in this case, which is a report signed by a Mr. J. A. Vandal, long-time chief parole officer and secretary of the Pardon Board and Parole Board, dated July 1, 1968. The Vandal report indicates that it had been a policy of both the Parole and Pardon Boards not to hear inmates of the State Farm except in emergencies, since it was believed that they had received maximum consideration by the court when they were sentenced to the State Farm.

Since this court is permitted under Subsection 41 of Section 31–10–02, N. D.C.C., to take judicial notice of official acts of public officers, and as the records

of the Pardon Board are such, this court asked the present clerk of the Pardon Board and Parole Board to review the records of both boards. The records of the Pardon Board disclose:

"1958—Ten (10) State Farmers paroled and two (2) * * * sentences * * * commuted.

"1959—Two (2) State Farmers paroled and two (2) * * * transferred to the State Hospital.

"1960—Three (3) State Farmers paroled and two (2) * * * sentences * * * commuted.

"1961—Six (6) State Farmers paroled and one (1) sentence commuted.

"1962—Three (3) State Farmers paroled and one (1) sentence commuted."

"During this period of time the Pardon Board reviewed files of additional State Farmers but did not give them consideration. In practically all those that were paroled, it was because of hardship on the families or where the wife was not able to adequately handle her finances." Letter to Supreme Court of North Dakota from Irvin Riedman, Chief Parole Officer and Clerk of Pardon Board and Parole Board, October 30, 1973.

The records of the Parole Board subsequent to 1963 disclose:

"1964—Four (4) State Farmers paroled.

"1965—Six (6) State Farmers paroled, and one (1) put on Work Release.

"1966—One (1) State Farmer paroled.

"1967—Two (2) State Farmers paroled.

"1968—One (1) State Farmer paroled, and one (1) sentence * * * Fixed and Determined."

Letter to Supreme Court of North Dakota from Irvin Riedman, Chief Parole Officer and Clerk of Pardon Board and Parole Board, October 30, 1973.

This report indicates a significant administrative practice.

In light of this report may we not assume that the General Affairs Subcommittee of the Legislative Research Committee for 1961–63 interim was cognizant of the Pardon Board's practice of exercising jurisdiction over persons committed to the State Farm; that when the full committee accepted the recommendations of the subcommittee it intended that the parole duties previously performed by the Pardon Board would be transferred to the Parole Board; that House Bill No. 534, which the committee prepared, was intended to accomplish this transfer; and that the Legislature in enacting the bill so intended?

The concluding paragraph of the summary of the Legislative Research Committee Report relative to "Pardon and Parole Laws" made to the 1963 session of the Legislature, at page F, reads:

"It is the opinion of the Committee that the election of the Governor, the Chief Justice of the Supreme Court, or the Attorney General is based upon their qualities to perform the principal duties of their offices and does not necessarily mean they are qualified to sit on the Pardon Board. It is also the Committee's opinion that the Pardon Board does not have adequate time to properly review each case appearing before it during the course of the annual three regular meetings. For these reasons *the Committee recommends that the duties in regard to probation and parole be transferred from the Pardon Board to a Parole Board* of three members appointed by the Governor, consisting of one member experienced in law enforcement, another a licensed attorney, and the third qualified by special education or experience. Such a board would also be able to meet for two or three days as often as six times a year in order to devote sufficient time to the study and consideration of each case." [Emphasis added.]

The court asserts that although there is no specific reference in Chapter 12–59 to persons committed to the State Farm, Chapter 12–59 must be considered to apply to such persons as well as to persons committed to the Penitentiary because for all practical purposes the State Farm is a part of the State Penitentiary and is administered by the same authority, to wit, the Director of Institutions.

Section 54–21–06.1, N.D.C.C., places the authority formerly vested in the Board of Administration in the Director of Institutions.

The pertinent sections from Chapter 12–51, N.D.C.C., follow:

"12–51–04. Farm operated with penitentiary—Warden to be superintendent —Employment of help.—The board of administration shall have charge and control of the state farm, and all property which said board has received or acquired, or hereafter may receive or acquire, in connection with the establishment and operation of said farm. *For administrative and operational purposes the said farm shall be deemed a facility of the state penitentiary and shall be operated in connection therewith.* \* \* \*" [Emphasis added.]

"12–51–05. Laws governing management of state farm.—The laws relating to the government and management of the penitentiary, so far as the same may be applicable and not inconsistent with the provisions of this chapter, in all respects shall apply to the government and management of the state farm as to the duties and authority of the board and its employees used at said state farm."

"12–51–06. Board of administration to establish rules for control of state farm and prisoners committed thereto.— The board of administration may establish, adopt, and enforce proper rules and regulations consistent with the provisions of this chapter for the control and administration of the state farm and the prisoners committed thereto."

"12–51–09. Board of administration may transfer persons from state farm to penitentiary or from penitentiary to state farm.—*When the board* of administration, either at the time of commitment or at any time thereafter, *shall determine* that for purposes of safety of other inmates or of the general public or for the purpose of discipline *it is necessary or proper that any person committed to the state farm should be transferred to the state penitentiary, such transfer may be made for such period as the board may deem proper.* Where a person who has been committed to the state farm conducts himself in such manner as to interfere with the operation of the farm, or with the welfare or safety of others, and where in the judgment of the board of administration the best interests of such person or the best interests and welfare of other persons committed to the farm so require, the board may direct that such person be removed from the farm and placed in the penitentiary. *The board also may direct that persons who have been sentenced to the penitentiary be transferred to the farm,* when such action seems desirable and for the best interests of the person so transferred and in no manner detrimental to the welfare of other persons who have been committed to said farm. The board may cause persons committed to the said farm to be assigned for work incident to the operations of the penitentiary or of any other institutions under the control of the said board." [Emphasis added.]

"12–51–10. Compensation, good time allowance, penalties of persons committed to state farm.—The laws relating to compensation, the merit system, good time and extra good time, and the imposition of penalties for misconduct provided by law for persons imprisoned in the penitentiary, shall be applicable to persons committed to the state farm, except in so far as they may be inconsistent with the provisions of this chapter."

The Parole Board responds that these sections of the Code do not make inmates

of the State Farm inmates of the State Penitentiary. It asserts that these sections are merely directed toward the Board of Administration (Director of Institutions) and the warden of the State Penitentiary.

Both sides argue convincingly. We resolve the issue by resorting to administrative practice as an aid to construction of the statute.

■ In construing a statute of doubtful meaning, courts have given weight to the long-continued practical construction placed thereon by officers charged with the duty of executing and applying the statutes. In State v. Equitable Life Assur. Soc., 68 N.D. 641, 282 N.W. 411 (1938), this court said in its syllabus:

"2. In construing a statute of doubtful meaning the court will give weight to the long-continued practical construction placed thereon by the officers charged with the duty of executing and applying the statute."

Later this court said:

"It is true the rule is that in construing a statute of doubtful meaning the court will give weight to the long-continued practical construction placed thereon by the officers charged with the duty of executing and applying the statute." In Re Black's Estate, 74 N.D. 446, 23 N.W.2d 35 at 38 (1946).

We again referred to this rule in Backman v. Guy, 126 N.W.2d 910 at 917 (N.D. 1964).

In both of the latter cases, this court refused to apply that rule, concluding in each case that the meaning was so clear that construction was not necessary.

In the instant case, however, we believe that the statutes are to some extent ambiguous and that therefore this practical rule of construction would be of aid in determining the intent of the Legislature. We conclude that the Legislature in enacting House Bill No. 534 intended to place the parole jurisdiction previously residing in the Pardon Board in the Parole Board, and that as the Pardon Board had previously exercised jurisdiction over State Farm inmates, jurisdiction over those inmates was now placed in the State Parole Board. An examination of Chapter 12–53, N.D.C.C., relating to suspended sentences and suspended imposition of sentences, before and after the enactment of House Bill No. 534, reveals in Sections 12–53–06, 12–53–07, 12–53–08, 12–53–10, 12–53–11, 12–53–12, 12–53–14, 12–53–15, and 12–53–16, the words "parole board" were substituted for the words "board of pardons", disclosing an intent to transfer from the Pardon Board to the Parole Board parole jurisdiction of all persons convicted of a felony.

Accordingly, we conclude that the trial court answered the second question correctly.

The case is remanded for further proceedings conformable to law.

VOGEL, TEIGEN, PAULSON and KNUDSON, JJ., concur.